All right, good morning, and welcome to the Ninth Circuit. We've got a couple cases that we're hearing argument in today, and we also have a couple cases that we're going to submit without argument. Before we start with that, Judge Sanchez and I would like to welcome back Judge Brattle and thank her for helping us with our busy docket out here in the Ninth Circuit. Before I get into the argument cases, we're going to sit and we're going to submit a couple cases without argument. Those two cases are case number 22-218, Cora v. Garland, and case 21-929, Lopez-Franco v. Garland. We're going to hear argument in two cases. The first one of those will be a case that we will be submitting without argument. I think our Petitioners' Council can appear by video it looks like. Can you go ahead and say something to make sure we can hear you? Good morning, your honors. Yeah, we can hear you. That sounds great. Thank you, Ms. Lipkin. So you will start. I'm sure you probably know the drill, but we have ten minutes of argument per side, and you can let us know how much time you plan to reserve for rebuttal. You may proceed. Will do. Go ahead. May it please the court. Good morning, your honors. I am Ina Lipkin on behalf of the Petitioner. This is an immigration-related case. Before the court, Petitioner contends that both the immigration judge and the Board of Immigration Appeals erred in failing to consider the level of harm that he suffered in India so as to qualify him for asylum based on past persecution and a well-founded fear of persecution. The petitioner contends specifically that both agencies, the court and the board, failed to consider that the two attacks that he endured by members of the ruling Badaw and BJP parties in India caused him to suffer serious injuries that required medical treatment, which he supported in the record at AR 518. And inexplicably, both bodies ignored that harm. Additionally, they ignored the fact that his father, a supporter of the Mon party, was harmed as well and suffered injuries that caused his death. Moreover, after the petitioner had fled India, both the Badaw and BJP parties had come to his home ominously inquiring about him so that when looking at the various incidents of harm, they together rise to the sufficient level. The other point that petitioner makes is that both the court and the board erroneously found that he could safely relocate. And he contends that the fact that the ruling parties continue to maintain an interest in him as evidenced by the visit to his home with threats against him. Plus, both his and the government's background documentation compel a finding that he could not safely relocate. Specifically, the government's own Canadian Refugee Board document at 588 and 589 in the record indicate that Punjabis who fear ill treatment, as does this petitioner, would not be able to safely relocate. And if he were to be put on a chronic offender list, that he could also not safely relocate. Could I interrupt you for a moment? I was interested in hearing your thoughts about the case of Singh v. Whitaker on the relocation question, because it seemed to me that that case lines up in many respects to the facts of this case. Is it your view — I don't know if you're familiar with the case. Is it your view that the — that the board inappropriately limited its inquiry to whether the Punjabi police would try to seek him out in other regions of the country? Or — Go ahead. Yes, we actually argued that case extensively in our analysis of the well-founded fear issue in our brief. And one of the arguments we make is that both the judge and the board erroneously affirming the judge's failure to really delve into whether the petitioner would continue his support of the Maad Party and his erroneous failure to acknowledge that the petitioner credibly testified that he continues to support the party from within the United States, so that it's presumed he would continue to do so if he returned to India and thus would face a risk of harm. And that analysis was, you know, argued in the opening brief. Do you — oh, go ahead, please. Do you — do you — did you argue that to the board? Or when — Whitaker's — I guess it came out in 2019. Is that correct? Yes, Your Honor. I'm sorry, this thing versus Whitaker. There's a lot of Whitaker cases, I suppose. And so did you — do you remember if you argued that to the board? Oh, let me take a quick peek. I know it was in our opening brief. I'm just going to take a quick look. Is that what you mean? Or to the board? Right. Well, when the case was before the board, let's see. Give me a second. I don't — I'm not sure that case had come out yet because I don't see it in our arguments. Well, because in some ways it doesn't matter for, like, exhaustion or waiver purposes because the board, I believe, actually cited the case, right, and relied on the case. That's right. And we did argue, you know, the inability to relocate within the body of the opening brief to the board. So that — definitely that's not exhausted. And we had argued that he couldn't safely relocate and that living in hiding was not an option, although that appeared to be — Well, I guess the reason I'm asking, counsel, about it is because it's an odd thing to think that the board just ignored saying when it actually cites it. You know, oftentimes it's kind of — we have case law that says the board doesn't have to, you know, discuss various — the agency doesn't necessarily have to discuss certain pieces of evidence or something. We sort of have an assumption that they do. But then here they even go beyond that and they cite to Singh versus Whitaker to this very case. So, I mean, what is your thinking as to why the court would have cited to it, but also ignored it and not applied it? I mean, I don't know why the board decided to ignore that, but it seems to me that the board supported the judge's finding that there was a lack of harm rising to the requisite level and found that that was a sufficient reason to support — It did that. I don't think when the immigration judge decided the case, I'm not sure that Singh versus Whitaker was out, or at least it was — you know, they were very close to each other. So that wasn't too surprising, I guess, if the immigration judge didn't cite it. But then the BIA does actually cite the case. And so I'm trying to — you know, when we review the BIA decisions, I'm just trying to — what's your best argument, I should ask, for us concluding that the BIA didn't consider the case and consider what it requires if it actually cited to the case? Actually, your honor, I had just looked at our brief to the board and on administrative record number 22, we do cite to Singh v. Whitaker. So to me, that seems like a clear error. At the very least — Let me make sure I understand. Make sure — one thing. Did you — I probably forgot, but did you want to reserve a few minutes or something for rebuttal? Did you? A minute would be fine. Great. So let me ask you, so if you cited it to the board — you know, this new case comes out after the IJ decision. You cite it to the board. The board cites it in its decision. It just seems like it would be a little bit of a stretch to conclude that the board did not — was not aware of the case, did not apply the case. I mean, the board would have to be — would have to be aware of it, cite to it, and ignore it. We don't normally assume that, I don't think. That's what we argued. I mean, but is it your view that the board considered the specific factor of whether his continuing to espouse beliefs and support for the Mon party and other regions of the country could pose a risk to him, whether the board or the IJ considered that as a circumstance for or against relocation? I think that both bodies did not consider it and instead relied on the fact that he's young and that he could start a life elsewhere just because he was able to do so in the United States while completely ignoring the danger it would pose to him if he continued with his Mon party support if he relocated. I'll reserve the rest. Would you want to reserve the remaining counsel? All right. Yes, please. Do either of my colleagues have any further questions for now? All right. We'll hear from the government then. Good morning, your honors. May it please the court, Jesse Carlson for the government. So the first thing I'd like to talk about, I'll certainly address the points that we've been discussing regarding Singh v. Whitaker and the other issues regarding past persecution. But the first thing I want to stress for this case is the standard of review. And the standard of review is very important here where, you know, this Court should only be looking at whether or not the record compels a different conclusion. And so obviously, your honors are aware of that standard, but that's a very deferential standard. And in this case — Yeah, so I think we're all very familiar with that. Right. Let me see if I can get right to the nub of this case. And I don't know if my colleagues agree with me. It's an odd thing in the sense that, you know, we've got this newer case that comes out. IJ doesn't have the benefit of that case. The BIA does. It's presented to the BIA. The BIA actually cites the case. I think, as Judge Sanchez was saying, I don't see in the BIA's decision where it explicitly addresses that issue in Singh about the second issue in Singh, which is whether or not somebody who's going to continue to proselytize for their position, so to speak, is going to experience, you know, if that puts them in a different position. That is mentioned in the Singh v. Whitaker case. The Singh v. Whitaker case is cited in the BIA's decision, but the BIA doesn't directly address that. So what's your best response to that? So with regard to Singh v. Whitaker, as you pointed out, the Board was certainly aware of the case. And so, you know, presumably the Board considered it. And if you look at the record in its entirety, you'll see that the IJ also talked about, you know, the transcript reflects the fact that Petitioner did indicate that he will continue activities when he goes, if he were to go back to India. And he described the kinds of activities that he was working, you know, he was passing out pamphlets, he was doing some activities that the agency found to be relatively low level in nature. And I think that's one of the important considerations is that both the IJ and the Board were looking at what this individual was doing with regard to his party activities. And the other thing, the IJ... Can I ask you a question about the Singh v. Whitaker case? Do you think it is laying out a sort of, that you have to address, that you have to explicitly address that particular issue? Is it laying out a requirement for that? Because if that's what it's doing, it's hard to see how you don't lose. I don't think that it necessarily would stand for the proposition that you have to explicitly address it. I think there has to be record evidence to show that the agency did, in fact, address it. And I think here the agency did. The IJ at one point asked the parties for evidence to show what was happening with regard to people like Mr. Singh in other parts of the country. So, you know, the IJ was interested in what was going on outside of Punjab. Why wouldn't the Board have to, the context that Whitaker was operating under, and I think might operate here is the rebuttable presumption that the government bears the burden at that point. So let's assume that petitioner here has established past persecution and now the burden falls on the government to prove that relocation would be safe and reasonable for him to do so. In Whitaker, it seems as if one of the key pieces of it was the continuing to espouse those beliefs and what would oppositional party members or other local authorities do in that circumstance, not just the Punjabi police trying to find him. And that seems to line up almost exactly here as well, where the Board's decision here reflected how likely was it that the Punjabi police would try to find him elsewhere and not reflect other analysis that formed the basis for the past persecution claim. So I guess my question is, isn't it incumbent on the Board to consider those factors that are in the record and determine whether relocation is reasonable here as well? Yes, I think, again, the Board did, it appears to me in the record, maybe it's not as explicit as it should be in the decision, but the Board did consider the activities outside of Punjab. And I think the IJ and the Board both looked at, you know, the tenant verification system that was raised. They addressed that issue and indicated that, you know, even assuming that was something that was utilized because of petitioner's activities and what he was doing for the political party, they didn't believe that outside of Punjab he would rise to any, that anybody would be looking for him or anybody would be seeking to harm him based on those activities because he wasn't a militant leader or he wasn't, not even to that high threshold. He was engaging in activities that they thought would, basically, you know, wouldn't be of interest to any of the government officials or the local police or anybody like that. Again, the Board could have been more explicit, I think, in its analysis, but the record does reflect that these things were considered. And as I was pointing out earlier, the IJ specifically asked the parties to provide, the IJ was interested in what is happening to people like Mr. Singh outside of Punjab. Is there any evidence that they are being persecuted or harmed by any government officials outside of Punjab based on similar activities? The IJ asked for that evidence. Ultimately, nothing was provided. There is no evidence that demonstrated that that was happening. That strikes me as potentially having placed the burden on petitioner to establish that evidence, where in the context of establishing past persecution, it would be on the government to establish that those activities, that the identification system wouldn't be used to target him outside of the Punjab region. Do you think there was an improper burden shifting going on here? So the BIA's decision said that the IJ properly, let me see if I get the quote correctly, that the IJ properly considered the government's burden. Where in the record does it suggest that the IJ was placing the burden on the government and that the government overcame its burden? So, Your Honor, excuse me, I think the interesting thing is in this case, and I agree that it might be a little bit confusing perhaps in the decisions in the briefs as far as the allocation of the burden is concerned. I think as the board indicated, the board indicated that the, well, first of all, I just want to step back and point out that the agency did not find past persecution in this case. And I think that's a very important point to point out because it's almost as if you need a flow chart to kind of figure out how the burden would be allocated based on a number of factors. And here there was no past persecution, but let's just assume that that had been established. If that had been established, then the burden would shift, of course, to the government. And I think what happened here is the agency analyzed the situation essentially under both burdens. And so, you know... Well, I would agree that the board analyzed it under both situations because the board has language saying even assuming that petitioner had established past persecution, we would still find relocation. But the board also seemed to indicate as if the IJ had done the same. And I'm not seeing in the record that the IJ had actually allocated the burden properly, at least in one respect, to the government to prove, you know, these issues, you know, as to whether he had demonstrated that the identification system would be used by oppositional members or others. And it seems to me as if it should be the to establish evidence that that would not be misused. Well, the IJ indicates it doesn't explicitly say the government met its burden. It does say that the burden was met by preponderance of the evidence in its decision. And I think, again, that... And then the board kind of takes it a little bit further and assumes, I think, that the IJ was saying the government met its burden by preponderance of evidence because that would be the appropriate standard that the government would have to meet. And if you look at the whole, the record as a whole, it looks that the agency did consider all of these factors. And so I think it's certainly, again, maybe perhaps inartfully drafted in some places and makes it a little bit confusing. But if you look at the record as a whole, and ultimately the board's decision, the burden was allocated to the government assuming, making an assumption that didn't need to be made because there was, in fact, no past persecution established here. But the court, or the board, I'm sorry, did analyze it that way. Well, just to round it out, Singh v. Garland is a case that is also pretty similar in facts that does establish that the record compels a finding of past persecution based on evidence of death threats, physical violence against another MOND supporter, and being forced to leave their home under those circumstances. Why doesn't the evidence compel the conclusion here under similar facts? In this case, you know, first of all, as I mentioned earlier, the standard review is very differential. But even that being the case, persecution is very extreme, and there are several other cases where there are far more extreme situations of harm. And often, a lot of the other cases involve police officers who inflicted that harm. In this case, there were individuals who were party members, reportedly party members. The credible evidence assumes that. However, they were not identified. There's a somewhat of an issue as to the identification of these individuals as far as, you know, official government actors. They, you know, Mr. Singh couldn't specifically identify them other than, say, their party members. You know, I think the issue, you know, the harm as well, you know, there are other cases where you have, you know, sexual assault. You know, there's things that rise to a higher level. And I think the agency here simply concluded based on what they had, the two incidents of harm, the, you know, the police report wasn't filed for 15 days after the incidents. There were some threats that were relatively vague in nature. Certainly, it's all fact-specific analysis. And I think in this case... If I remember correctly, the police also essentially shined away the complaint and said, don't come back to us with one of these complaints. And so there's certainly evidence, unrebutted evidence of acquiescence to that, to the harm that he suffered in this case. Well, Your Honor, again, I think when you look at this case compared to other cases the circuit has decided, I think it's a fact-specific determination. And I think the cases often run the spectrum on the level of harm that satisfies the standard. And in this case, the agency concluded that it didn't... It was certainly abhorrent, certainly, you know, things that nobody wants to be happening to anybody, but it just didn't rise to that level of past persecution. Okay, I'm going to follow up, and sorry to hold you over a little bit. Okay, no problem. But back to... If we assume that they have... That there's past persecution, right? Then the burden is obviously on the government. So we do have a kind of an odd situation here where it's pretty clear to me that the BIA analyzed it with the burden on the government. But the BIA also said the IJ did that. And I think as you've kind of sort of acknowledged, the IJ's decision is not super clear that's what the IJ did. If I was to conclude that the IJ either screwed up or just analyzed it as if there was no past persecution, which I guess wouldn't be a mistake, but never did put the burden on the government. But then it gets to the BIA, and even if we assume the BIA misread what the IJ did, what do I do with that if I think... I still think... My instinct is that I still have to review the BIA's decision for substantial evidence, that is, whether the record compels a different conclusion than what the BIA concluded. And so it seems to me that even if I think the BIA misread the IJ opinion, but did properly put the burden on the government and analyze it that way and that the record doesn't... Do I need to reverse the BIA because it made a mistake in how it read the IJ's opinion if I think that the BIA's analysis is correct, I guess is what I'm asking. Your Honor, I think certainly you could remand the case for an additional or new analysis. That would certainly be an option. I think in this case, I don't know that doing that would change the result given the fact that ultimately the agency did. Well, oftentimes it doesn't change. I guess I'm asking you differently. Oftentimes the result doesn't change, right, because the agency... What I'm asking is if I think that the BIA's own analysis was correct, or at least I guess it doesn't matter whether I think it's correct or not, it's supported by substantial evidence. The record doesn't compel a different conclusion. Would there be a reason to send it back just for the mere fact that the IJ, that it misread the IJ opinion, not in how the facts, not the facts of the IJ, but what the IJ actually legally concluded? Again, I think because the board ultimately got it right based on all of the evidence and the record, obviously I think that is an option. You could send it back. You could remand it to the board to... And then the board could ultimately send it back to the IJ, I believe. But I don't know that in this case it's necessary given the standard of review, but certainly that is something that Your Honor could do. Okay. So, I mean, I'm struggling with this exact same issue. Is it possible to read the IJ's opinion as saying, so there's no past prosecution, so there's no presumption of future prosecution, but when we look at the possibility of relocation, was he saying that Mr. Singh's fears were not well-founded because he could relocate to avoid them? Essentially that, I believe that's essentially what that prong satisfies. It's basically saying, you know, even if you have, even if he has a well-founded fear, he can relocate to avoid that potentially, and that's reasonable for him to do so. Okay, but that's a different question. So if he has a well-founded fear, he could relocate, but if he has a fear that's not well-founded because he can relocate, do you see what I'm saying? So if I'm afraid of living here but my fear is not reasonable because I can walk out that door and it's reasonable for me to do that, is that a plausible reading of what the IJ was doing? What the IJ appears to be doing is simply saying, you know, look, based on what you've been doing with this political party, you know, certainly there's a lot of evidence in the record of what's happening to individuals in Punjab, but you could, you know, you were able to move to the United States. You could move somewhere, you know, it is a very large country, you could move somewhere else, and because of what the kinds of activities you were conducting and taking part in, the local government is probably not going to want to harm you. They're not going to be very interested in you based on the record evidence, and there was no evidence proffered that shows that there are other individuals like Mr. Singh, excuse me, with his kind of specific activities who were, you know, being targeted by other, you know, other officials. There's a lot of evidence in the record about a bunch of different incidents happening. Most all of them were happening in Punjab, so I think that's what the IJ was considering when he was looking at relocation. But then this is, I think, the heart of the case that we're all wrestling with. The lack of evidence in the record, one way or the other, speaks to the fact that it seems as if the agency did not inquire as to what would happen to him outside of Punjab were he to continue espousing his beliefs. It's not just relocating, it's can, if it's the government's burden to demonstrate that he can relocate safely given his desire to continue those party activities to which he's entitled to do. And in that circumstance, I think Singh versus Whitaker would say you have to send it back for a new relocation analysis because the government didn't demonstrate that he wouldn't be targeted outside of the Punjab region were he to continue espousing his beliefs. The, I just, and I want to go back a point, again, I think it was mentioned earlier that the IJ didn't have the benefit of Singh, just as one point in the board did, so I think that can explain some of the difference in analysis. Actually, he did. Because the Singh case came down in January and the IJ's opinion came down two months later. I thought it was close, but thank you for that clarification. But even assuming that he did, I think, again, you know, the transcript does demonstrate and show that both, that the IJ was aware and obviously the board was aware that he did, Mr. Singh did intend to continue his activities. So certainly they considered, you know, in the whole analysis, they considered the fact and knowing when he, if he were to relocate, that he was going to continue to pursue those activities. I believe what it came down to is the kinds of activities he was pursuing they didn't believe rose to the level of presenting an issue for him outside of Punjab. So let me, let me follow up with you on, I'm sorry to keep you so long, but, okay, do a scenario with me. IJ issues the exact same opinion that it issued in this case. The BIA says to the, the BIA says IJ screwed up, didn't find past persecution. The way we read the IJ decision is that there was no past persecution. IJ never shifted the burden to the government. But on appeal, we think there was past persecution. So we're going to review this same record that was developed by the IJ and when we properly put the burden on the government, we are going to find that the government met its burden. Would that, and assume everything else is the same as this case, would there be a problem like, I mean, the government, the BIA could do that, correct? The BIA could do, the BIA does not have to, when it gets the, you know, I assume the BIA can, is allowed to disagree with the IJ on some issues and have a different conclusion. I mean, we get those kind of cases all the time. Right, yeah, I mean, as long as it's not clearly erroneous, I believe, you know, they can. No, but that's the facts. I'm not saying the BIA, the BIA is the facts at all. Okay. It would be disagreeing with the IJ's conclusion that there was no past persecution, right? So let's say it disagreed and said, we think the I, we read the IJ opinion as finding no past persecution, period. Not some, not with, right, you follow me? Yes. And then it says, and if there was no past persecution, then, but we, but we disagree with the IJ that there was no past, but we think that there was past persecution. But when we look at this record developed by the IJ, the government has still met its, so the government has the burden, contrary to what the IJ thought, but we think the government has met its burden. That's, if the BIA did that, would there, would that be reversible just because of that, I guess, you know, without looking at the merits of the, of whether or not the BIA's conclusion that the government had met its burden was supported by substantial evidence that, I mean, it seems to me, I'm asking this question because I think I know the answer. I think, I think the government, the BIA can, can reach a different conclusion than the IJ, right? So then the question is, if that's true, then what difference does it make if the BIA, if the exact same thing comes to us, but the BIA just, just, just misread that, the IJ's opinion? Because it's clear to me that the BIA put the burden on the government. Now, correct. It, it could be that we conclude that the BIA's analysis was incorrect. It's not supported by substantial evidence, but it's clear to me it the burden on the government. The big question is whether the BIA made a mistake in reading the IJ opinion a certain way, not the facts of the IJ opinion, but whether or not there was, whether the IJ had actually concluded there was past persecution and, and had, but I'm, I'm trying to figure out what difference that makes. Like, why, why does that matter to us? Because at the end of the day, what matters when there's a difference between the BIA opinion and the IJ's opinion, we go with the BIA's opinion, right? We don't, the IJ doesn't trump the BIA. It works the other way around. Unless there's a, unless, unless there's a factual issue that, that I, the BIA didn't take that into account. So that's what I'm, that's what I'm struggling with. I don't know why it matters that, whether the BIA read the IJ's past persecution thing right or not, if we're comfortable with the fact that the BIA actually, actually did the, found that there was, did analysis finding that there was past persecution and properly put the burden on the government. I believe that's correct, Your Honor. I mean, the, again, I think, I think all of the decisions could have been drafted, could have been drafted with more specificity. I think the board could have been more specific, but that's not the case. But earlier you said we should send it back if, if that happened, but I don't, that doesn't make any sense to me. We would be sending it back for the BIA to reach the exact same conclusion it did and just give the IJ the opportunity to fix its. I want to clarify my, I'm not suggesting that you send it back. I'm simply saying that certainly if that's something, you know, that's, it's always an option for the panel, of course, but that's not something that's necessary here because at the end of the day, the conclusion, the board did analyze the case under, under the standard that, again, it's almost, you have to, if there had been past persecution, it depends on what you find on kind of each of these prongs, but the board did provide the analysis with that assumption in mind. And so whether or not the IJ was clear in its allocation of the burden, I think if you, the IJ's decision was very comprehensive and it clearly took into consideration all of the record evidence. And again, I think it is a little bit confusing on the burden allocation, but it, it does essentially, in my reading, it seems to allocate it to the government. Okay, just to be clear, when you say it's a little confusing on burden allocation, where precisely is a little confusing? Is it confusing, is it confusing who the BIA put the burden on? It is not, and I think that's... Where is it confusing at? With regard to the BIA or the IJ? No, no, where's it, I think what you're saying is... Oh, the, well, the IJ says... It's a little confusing where the IJ put the burden. The IJ says that, that a preponderance of the evidence demonstrates, let me tell you the exact page, and again, I don't... I'm familiar with it, I just want to make sure you're, you're clear with us. No, I don't, I don't think that it's, the conclusion is, is necessarily confusing. I'm just saying I can see how there could be questions. When you read it, the IJ decision on internal relocation, on page 57 and 58, does say that the court finds by preponderance of evidence the Respondent could avoid future persecution by relocating. If the IJ was simply saying that there, well, the IJ had previously said there's no past persecution, there would have been really no reason to go through that analysis if it wasn't, you know, doing it based on, you know, a shifting, a burden shifting. There's other statements in the IJ's opinion that make it sound like it's putting the burden on the petitioner, but of course, the IJ has, in theory, two different, you know, it would be proper to put it, if it found that there'd been no past persecution, but... Correct. That, when I'm talking about how much that matters, how much does that matter since what we're reviewing is the BIA decision? That's what I'm getting at. And you keep going back to the IJ opinion. Oh, no. Well, I was just doing that to point out, I mean, the BIA decision is the decision you're reviewing, and it's the government's position that the BIA decision, BIA's decision, there's substantial evidence does support the BIA's decision on that point. And so, the burden was addressed. Let me follow up with that, because I think there's a burden shifting issue, because if you read exactly what the BIA's decision says, it says, even assuming the respondent established past persecution, which he did not, the immigration judge properly determined that the DHS met its burden of rebutting the presumption of future persecution. The inherent in the BIA's own analysis is the supposition that I don't think is founded in the record that the IJ placed the burden on the government to then establish that relocation would be safe. But if that were the only issue, and let's say the BIA had gone on to actually analyze the potential of petitioner espousing his beliefs in other parts of the country, that, I might agree in that case with Judge Van Dyke, that that would then, that's the thing that we would look at. But what's bereft of the agency's analysis, whether it's the IJ or the BIA, is any analysis that in Singh v. Whitaker was found to be reversible of what's going to happen if he, if this person relocates to another part of the country and he continues to advocate for a separatist state under the Man Party. Will oppositional members target him as they had, and would local authorities target him as they had? Not because he's supposedly a militant that the Punjabi police would try to reach him, but for those other activities. And if that is not being analyzed by the agency at all, then Singh v. Whitaker calls for the, for vacating and remanding for a new relocation analysis. So it's, to me, it's the combination of the burden shifting and the absence of that type of analysis. I'm wondering, you know, if you could respond to that. Yes, Your Honor. I, again, I think the, the, that analysis, you know, the board, again, wasn't explicit in that analysis. But if you look at the record, and I think it's page, I'm looking at, I think the board decision does generally touch on that point. Where in particular? Let's see here. I mean, to some extent on page two at the bottom, when he, the board does talk about the IJ's determinations about the landlord-tenant system and, you know, kind of his low-profile status and what he was doing with the party. And, and kind of that's, that whole analysis, I think, does talk about, you know, those things. Again, it's not specific in its, in its articulation of, you know, exactly what would be happening outside. But it does, it does talk about kind of those issues generally. I mean, it's talking about them in the context of how the IJ framed it, where you, petitioner, have brought forward, have not brought forward evidence that the landlord-tenant system has been misused to target non-party members. Or you, petitioner, has not brought forward evidence that, that low-level people, you know, would be targeted by the police, as opposed to government. Are you demonstrating that he would not be targeted using the system? Well, the government also proffered evidence along these points. And so, I don't think, I mean, the government's, I don't think this specifically says, and I have to go and reread it again, this section specifically puts the burden on petitioner. I think the evidence the government provided also supports these points pretty well. And so, I think, I think that's, you know, that's where this, the decision seems to kind of address everything, you know, assuming that the burden shifts and assuming that the burden was on petitioner, because there was no past persecution. And so, as I mentioned before, it's almost like a flow chart you have to look at and kind of figure out exactly where it lands. But when you look at the record comprehensively in the board's decision, the board seems to address the salient points. Okay. All right, we're taking way over. Sorry, any additional questions? All right. Thank you very much. Appreciate it. Hear from Petitioner's Council. Oh, Your Honor, I'll rest on the arguments contained in the opening brief, which address the points that the panel has made. Thank you. You have any follow-up questions? All right. Well, thank you, counsel. From both sides, a very helpful, lively argument this morning. We'll go to our next case.
judges: VANDYKE, SANCHEZ, Vratil